**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-103-RCL** |
| **v.** | : | |
| | : | |
| **JOHN LAMMONS,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant John Lammons to 30 days' incarceration, 36 months' probation, and $500 in restitution.

## I.    Introduction

Defendant Lammons, a 61-year-old jiu-jitsu instructor, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Defendant Lammons pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 30 days' incarceration and 36 months' probation is appropriate

---

[1] Although the Statement of Offense in this matter, filed on November 8, 2022, (ECF No. 27 at 2) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

in this case because (1) before entering the Capitol Building, Lammons saw chaos that should have deterred him from entering, including police using a concussion grenade and pepper spray in response to rioters' attacks; (2) Lammons entered the Senate Wing Door at 2:16 p.m., less than five minutes after it was violently breached by rioters; (3) Lammons later described this group of rioters as "totally professional"; (4) while in the Crypt, Lammons appeared to smoke marijuana and helped another rioter to do the same; (5) Lammons ran into a group of rioters that were rushing a police line and told other rioters to "hold your ground" while he was in the Capitol; and (6) Lammons struck a victory pose as he walked towards the exit of the Capitol, shortly before climbing out of a broken window.

The Court must also consider that Lammons' conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Lammons' crime support a sentence of 30 days' incarceration, 36 months' probation, and $500 in restitution in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 27 (Statement of Offense), at ¶¶1-7.

### Defendant Lammons' Role in the January 6, 2021 Attack on the Capitol

On January 4, 2021, Lammons drove from Galveston, Texas to Washington, D.C. On January 6th, Lammons walked to the U.S. Capitol's upper west terrace and towards the breach at the Senate Wing Door.  The U.S. Capitol was first breached at this location at 2:13 p.m. by a rioter who jumped through the window and over broken glass.



Figure 1

Less than four minutes after the entry depicted above, Lammons pushed past other rioters to enter the U.S. Capitol Building at the same location. Gov't Ex. 1 at 0:02.



Figure 2

Lammons can be seen circled in Figure 2 above wearing a black baseball cap, a black zip-up jacket, and olive-green pants. In the lobby area, Lammons held his cell phone over his head to record rioters as they moved about the area. *Id.* at 0:05. Lammons then turned to the right and

walked past the shattered glass on the floor from the smashed-in window. From there, Lammons traveled to the Crypt where he continued to record the ongoing riot. Gov't Ex. 2 at 1:45-2:38. Despite the chaotic scene, Lammons stopped before a statute to take a video of himself showing a peace sign with his fingers. Gov't Ex. 2 at 0:31-0:34, Gov't Ex. 8.

 

Figure 3                                Figure 4

    While rioters continued to press forward against a line of U.S. Capitol Police ("USCP") officers, Lammons pulled out a small object consistent with drug paraphernalia to light and smoke a substance with another rioter. Gov't Ex. 2 at 5:00-5:30. In Figure 5 below, Lammons is holding the object close to his mouth with his left hand and holding an ignited lighter up to it with his right hand. In Figure 6, the other rioter is similarly holding the object to his mouth and Lammons is extending the lit lighter to him. Given the manner of consumption and Lammons' consistent use of cannabinoids during the pendency of this case, the government believes Lammons likely smoked some form of marijuana. *See* ECF 29 at 3.



Figure 5



Figure 6

Roughly one minute later, rioters broke through the line of USCP officers and pushed the officers towards the House of Representatives side of the U.S. Capitol Building. When this break happened, Lammons ran into the forward-moving crowd. Gov't Ex. 2 at 7:00-7:20. These rioters proceeded to chant and push against the retreating officers. Gov't Ex. 3.



Figure 7

In a video captured by Lammons around this time, Lammons stands in front of officers in the Crypt and tells the other rioters to "hold your ground." Gov't Ex. 4.



Figure 8

After the rioters cleared the police officers out of the Crypt, Lammons continued to roam about the Capitol and made his way towards the U.S. Capitol Visitor Center ("CVC"). Once there, Lammons confronted another line of USCP officers who tried to stop rioters from entering the CVC. Although the officers physically pointed Lammons towards the exit to leave on several occasions, Lammons stayed in the area for some time. Gov't Ex. 5 at 2:55-4:20.



Figure 9

As Lammons returned through the Crypt, he paused for a moment before someone with a camera and raised his arms over his head in a victory pose. Gov't Ex. 6 at 0:10-0:15.



Figure 10

As Lammons returned back to the Senate Wing Door, he again pulled out his phone to record the second breach of the location as rioters streamed into the U.S. Capitol. Gov't Ex. 7 at 0:05.



Figure 11

8

After several more minutes in this area, Lammons eventually climbed out of one of the broken windows next to the Senate Wing Door and left the U.S. Capitol building at 2:52 p.m. Gov't Ex. 7 at 2:42-2:55. In total, Lammons spent over thirty minutes inside the U.S. Capitol on January 6, 2021.

After Lammons left the U.S. Capitol, he sent several messages to a WhatsApp group. In those messages Lammons said that he "wanted to just get inside and see what they were saying" and that the initial group of rioters inside the U.S. Capitol were "totally professional." Lammons also explained that he "talked [his] way out" of getting arrested.





Figure 12                                      Figure 13

*Defendant's Interview*

On January 13, 2021, Lammons submitted to a pre-charge interview by the FBI. During the interview, Lammons stated that he saw police manning bicycle rack barricades by the scaffolding outside of the U.S. Capitol Building and he saw other individuals climbing on a nearby podium. Another individual shouted "take this, it is yours" in reference to the U.S. Capitol.

9

Lammons then saw someone throw a bottle from the crowd and the police throw a concussion grenade into the crowd. Lammons and other members of the crowd proceeded past the bicycle rack barricades after the police backed up to the U.S. Capitol doors. Around this time, Lammons saw police using pepper spray against rioters. Once in the Capitol, Lammons heard police officers telling the crowd to get out and get back. Despite these commands, Lammons did not immediately leave the building. During the interview, Lammons showed the FBI several videos from January 6, including Government's Exhibits 4 and 8.

*The Charges and Plea Agreement*

On March 1, 2022, the United States charged Lammons by criminal complaint with violating 18 U.S.C. § 1752(a)(1)–(2), and 40 U.S.C. § 5104(e)(2)(D) and (G). On March 24, 2022, Lammons voluntarily surrendered without incident to law enforcement. On March 28, 2022, the United States charged Lammons by a four-count Information with violating 18 U.S.C. § 1752(a)(1)–(2), and 40 U.S.C. § 5104(e)(2)(D) and (G). On November 8, 2022, pursuant to a plea agreement, Lammons pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

Lammons now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration, 36 months' probation, and $500 in restitution.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Lammons' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Lammons, the absence of violent or destructive acts is not a mitigating factor. Had Lammons engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Lammons' case is his general demeanor throughout the riot. Lammons entered the Capitol Building undeterred by the various scenes of chaos and violence he witnessed on restricted Capitol grounds, including police using a concussion grenade

and pepper spray in response to rioters' attacks, a bottle being thrown from the crowd, and police retreating from the bicycle racks as Lammons and other rioters moved towards the U.S. Capitol. Then, when Lammons first entered the Senate Wing Door, only minutes after the initial breach, he immediately held his cell phone up to record the scene. Once in the Crypt, he smoked what is believed to be marijuana and captured a video of himself displaying the peace sign. He then rushed a police line with the crowd. Later, as he walked to exit the U.S. Capitol, Lammons threw his arms up in a victory pose before someone with a camera, and then exited through a broken window. These actions show that Lammons viewed the events of January 6th with not only flippancy, but also great enthusiasm and conquering fervor. Lammons also encouraged other rioters to act when he told them to hold their ground as he stood with them before a police line. Later, Lammons also lied and minimized his and other rioters' conduct when he described the first group of rioters in the U.S. Capitol as "totally professional."

Lammons also purposefully ignored the orders of federal law enforcement officers to leave during the riot. For example, he decided to linger in the hallway to the Capitol Visitor Center despite several visual indications from the officers that he was not supposed to be there. Furthermore, the government is not aware of any remorse shown by Lammons for his actions on January 6th.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Lammons

As set forth in the pre-sentencing report ("PSR"), Lammons was previously convicted of involuntary manslaughter in 1986 after he shot someone in their home. The altercation began when Lammons held up a firearm to the sleeping victim's head who fought back when he awoke. During

the ensuing struggle, Lammons shot and killed the victim. Afterwards, Lammons and another individual abandoned the victim's body in a car, and Lammons burned several pieces of physical evidence.

During the pendency of this case, Lammons had periods where he consumed marijuana. *See e.g.*, ECF 29 at 3. As noted in the PSR, Lammons tested positive twice for marijuana in the first half of 2022. He ceased use in June 2022, but he tested positive again on two occasions shortly before and after the plea colloquy. *Id.* The March 31, 2022 conditions of Lammons' release require that he not possess or use a controlled substance. ECF 11 at 2; ECF 30 at 5.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B)-(C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

13

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

A sentence of imprisonment in this case is also necessary to deter any future conduct by Lammons. Based on his actions, Lammons viewed his conduct on January 6th with a degree of

levity that squarely contradicts the harm caused by him and other rioters. Lammons' conduct also involved a series of poor decisions and poor judgement – from ignoring the chaos and violence on restricted Capitol grounds which should have served as warning signs not to enter the Capitol Building, to joining a group of rioters rushing a police line inside the Crypt, to encouraging those rioters to hold their ground against the besieged police officers, to ignoring police officers' instructions to leave while in the area of the CVC, to exiting the Capitol Building out of a broken window. There were several moments at which Lammons could and should have stopped himself, but he failed to do so. Lammons' actions also came after serving a sentence for manslaughter. Additionally, Lammons has failed to show remorse for his actions on January 6, and as noted above, after the riot, lied and minimized his and other rioters' conduct by describing the first group of rioters in the Capitol as "totally professional." Therefore, Lammons must serve a term of imprisonment to deter him from future criminal conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Lammons based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Lammons has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is

---

[2] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." *Id.* Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49

16

("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the

sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Daniel Warmus*, No. 21-cr-417 (PLF), the defendant pleaded guilty to a charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building). Warmus was part of the first wave of rioters to enter the U.S. Capitol on the west front and he filmed the events of the day extensively. Similar to Lammons, Warmus also encouraged other rioters by waving them towards the East Rotunda Doors to assist other rioters. Gov't. Sentencing Mem., *Warmus*, 21-cr-417, ECF No. 36 at 2. On the other hand, Warmus also deleted January 6th media from his cell phone and harassed police officers while on pretrial release. *Id.* At sentencing, Judge Friedman sentenced the defendant to 45 days in jail.

In *United States v. Frank Scavo*, 21-cr-254 (RCL), the defendant pleaded guilty to a charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building). Scavo was one of the first rioters through the East Rotunda Doors and stood closely by police officers to film them with his cell phone. Unlike Lammons, Scavo only remained in the U.S. Capitol for 10 minutes, made no encouraging statements to other rioters, and did not consume marijuana within the building. Gov't. Sentencing Mem., *Scavo*, 21-cr-254, ECF 37 at 2. Also, both defendants sat for an interview with the FBI and produced evidence to the FBI. This Court sentenced Scavo to 60 days' incarceration.

In *United States v. John Getsinger*, 21-cr-607 (EGS), the Defendant pleaded guilty to a charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building). Getsinger, like Lammons, spent nearly 40 minutes in the U.S. Capitol and appeared to smoke marijuana in the Rotunda. Gov't. Sentencing Mem., *Getsinger*, 21-cr-607, ECF 50 at 2. However, Getsinger also entered Minority Leader Kevin McCarthy's office and tried to justify his actions

after the fact. *Id.* at 19, 23–24.  Judge Sullivan sentenced Getsinger to 60 days' incarceration and 36 months' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. [3]

---

[3] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104  may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *see generally Appellee's Brief for the United States, United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law.

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of  confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose

**V.       Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' incarceration, 36 months' probation, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Andrew Haag*
Assistant United States Attorney
Andrew S. Haag
MA Bar No. 705425
Assistant United States Attorney
601 D Street N.W.
Washington, D.C. 20530

---

multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992). In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

<u>**CERTIFICATE OF SERVICE**</u>

On this 30th day of January 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*/s/ Andrew Haag*
Assistant United States Attorney
Andrew S. Haag
MA Bar No. 705425
Assistant United States Attorney
601 D Street N.W.
Washington, D.C. 20530
