UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America ) | |
| ) | |
| v. ) | USDC No. 22-cr-103 (RCL) |
| ) | |
| John Lammons, *defendant*. ) | |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant, through undersigned counsel Nathan I. Silver, II, Esq., appointed by this Court under the Criminal Justice Act, submits this memorandum to aid at sentencing on February 6, 2023 at 11 o'clock a.m. when he appears by videoteleconference before the Court for his sentencing hearing.

1. The defendant was charged on March 1, 2022, and arrested on March 24 in criminal complaint, 22-mj-0044 (ZMF). On March 31 he made his first appearance in the case before Magistrate Zia M. Faruqi. He stood charged with four misdemeanor offenses resulting from his involvement in the Capitol Hill protests and riot of January 6, 2021: (a) Entering and Remaining in a Restricted Building (Count One), in violation of 18 U.S.C. §1752(a)(1); (b) Disorderly and Disruptive Conduct Which Impedes the Conduct of Government Business, in violation of 18 U.S.C. §1752(a)(2); (c) Disruptive Conduct in the Capitol Buildings, in violation of 40 U.S.C. 5104(e)(2)(D), and (d) Demonstrating, Picketing or Parading in a Capitol Building, in violation of 40 U.S.C. 5105(e)(2)(G) ("Demonstrating"). He was released on his own recognizance with conditions. (ECF Doc. 11, March 31, 2022) On April 6, the defendant was arraigned on a criminal Information that charged the same offenses.

2. The defendant entered a plea of guilty to Count Four ("Demonstrating") of the Information on November 8, 2022. The remaining charges will be dismissed by the government at sentencing, per the terms of the Plea Agreement. (ECF Doc. 26)

3. On November 8, 2022, per a Plea Agreement with the United States, the defendant entered a plea of guilty to Demonstrating, a petty offense which carries a maximum sentence up to six (6) months imprisonment, a fine of up to $5,000, a term of probation not to exceed five (5) years and a $10 special assessment. As a petty offense, the U.S. Sentencing Guidelines do not apply. (Presentence Investigation Report ("PSI"), page 7, ¶31) The defendant agreed to pay $500.00 in restitution toward defraying the cost of repairing damage to the U.S. Capitol, repairs which were necessary after the riot.

4. Defendant and his counsel reviewed the Draft PSI (ECF Doc. 30) and lodge no objections to it.

5. While in the Capitol or on its grounds, the defendant did not commit any violent or destructive act, either to persons or property. Nor did he encourage others to do so.

6. The defendant's criminal record dates to his much younger days. His last criminal contact was in 1998, more than twenty-four years ago. With the exception of the offense of Involuntary Manslaughter, committed in 1986 when the defendant was twenty-five, for which he served a period of six (6) months in prison and thirty (30) months parole, the remaining charges were misdemeanors that were either dismissed or have an unknown disposition. The current offense is considered a Class B petty offense under the federal code, not subject to the federal sentencing guidelines, so although one's criminal history may be considered, it does not have a numerical effect on a sentencing range; there is no sentencing range for this offense. The

defendant submits his criminal history should not be viewed adversely in the Court's consideration in fashioning an appropriate sentence.. (PSI, pp. 7-8, ¶¶22-29)

7. The defendant was dismayed at the conduct and results of the 2020 election and came to Washington to protest Congress's certification of the Electoral College votes. For him, it was an exercise in his right to free speech, It was not to cause trouble or incite others to do so, and in fact he kept true to his purpose. He attended the "Stop the Steal" rally with a woman named Andrea, who traveled with him from Texas to Washington, then joined the crowd of people who marched to the Capitol. Again, it was to lend his voice in protest, not to show disrespect to the legal process, much less violate the law, that he went to the Capitol. He went inside the building as much out of curiosity as to record his protest: in a video he sent out, he said, "We honestly wanted to just get inside and see what they were saying…."[1]

8. The defendant did not take part in violence against the police or others, and did not steal, vandalize or destroy objects in the Capitol or the parts of the building itself. In fact, there were several instances in which the defendant tried to discourage or prevent such behavior.

(a) He tried to assist a police officer who was having trouble with an older man who was on the floor. "Let me have him. I'll take care of him," the defendant told the officer. The officer let the defendant take him to a safe area, in return for the defendant's pledge that he would "get your people to leave." After moving the man, the defendant returned to the officer and advised him that "they were not his people," that he was not with them, but he did what he could to assist.

---

[1] Like many others, the defendant may have had a mistaken belief that the First Amendment protections would apply even to a protest within the Capitol or on its restricted grounds. Of course, the Capitol and its grounds were closed on Jan. 6, and apart from that, demonstrations are never allowed in Capitol buildings, whether open or closed, notwithstanding whether or not a person enters legally.

(b) In another instance, the defendant viewed a confrontation of police and protesters inside the building.  He admits, as the Statement of Offense reports, that he called out, "Hold your ground," but he meant not to encourage protesters to resist but rather to *discourage* them from moving forward into the group of police, resulting in unnecessary, unjustified violence on the part of the crowd.

(b) Once the defendant left the building, he saw "a girl walk() up to him and (lay) a red brick on the wall. Lammons picked it up and laid it on the ground behind the wall to hide it from anyone using it.  He found it unusual because there wasn't any red brick in sight so (he) figured it was brought onto the Capitol grounds."[2]

9. Defendant understands that his conduct was disruptive, but submits that it wasn't purposely so, butt incidentally.  It was not to cause trouble or prevent the certification of the electoral votes for the president-elect that he came to D.C. on January 6th; it was simply to attend a rally and a peaceful protest.  He, like hundreds of others, entered the Capitol after others had breached it.  The government seems to contend in its memorandum that he referred to those who actually broke into the building as "totally professional."  The defendant submits that the government has misread the statement, perhaps because "professional" was a poor word choice.  The defendant was referring in fact to the conduct of those he saw once inside.  It's clear he meant that from these words: "...*after we left* some idiots came in and did some stupid things but the first group was totally professional." (italics added)  It's also clear that he was speaking of rioting that he learned of *after* he was out of the building.  By "professional" the defendant only

---

[2] From their interview of the defendant on Jan. 13, 2021, by Task Force Officer Aaron Arizemdi and Special Agent Travis Hutchins (File no. 266T-HO-3373046, FD-302, drafted on Jan. 25, 2021, by Agent Arizmendi, page 2 of 3, provided in pretrial discovery)

meant well-behaved or composed, not professional in the sense of a SWAT team or Army Rangers. It was after he left the building that he learned that havoc had erupted.[3]

10. This is not to deny that the defendant's peaceful presence, along with that of the many other peaceful protesters, emboldened those – the true "rioters" – who committed violent or destructive acts against persons and property. The sheer numbers of people makes this an object lesson of how a crowd can become a mob, then a riot..

10. The defendant regrets that his presence may have hampered the efforts of the police, whose hands were more than full, to keep order. But he did not countenance disorder and did what he could to suppress it.

11. The Court may also take into account that Mr. Lammons is a certified black belt in Jiu Jitsu and an instructor in that martial art. The defendant is his own weapon; he was more than capable of deploying it had he a mind to do so. Nor did he bring with him weapons that are associated with his art.[4] He desisted from using his martial skills because it was never his aim to hurt others.

12. The defendant has coöperated with investigators from the moment he became a suspect and was later arrested. In fact, on January 13, 2021, eight days after the riot, the FBI interviewed him at his job about his having been in Washington and entered the Capitol on the 6th. The agents were interested in his videos, which the defendant played voluntarily. . He also

---

[3] In the interview referenced above in ftn. 2, Task Force Officer Aaron Arizemdi and Special Agent Travis Hutchins report that the defendant said "he thought he was part of the first crowd to enter the Capitol building but heard a cop yell that a lady had already been shot. That's when Lammons realized there must have been a group enter from a different side of the building earlier." (File no. 266T-HO-3373046, FD-302, drafted on Jan. 25, 2021, by Agent Arizmendi, page 2 of 3)

[4] The Encyclopedia Brittanica notes that jujitsu (in Japanese, jūjitsu), is known as the "gentle art." (https://www.britannica.com/sports/jujitsu)

described his actions candidly and answered the agent's questions directly. The defendant took videos to record what he saw, not to use later for political purposes.

13.  The defendant asserts that his cooperation with the investigation and taking of responsibility in pleading guilty are expressions of contrition and remorse. He realizes the folly of his conduct.

14. Under 18 U.S.C. §3553(a) the following factors: (a) Factors To Be Considered in Imposing a Sentence. - The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider - (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner….

10.  The government recommends  thirty (30) days incarceration and three (3) years probation, along with the agreed-upon payment of $500.00 in restitution, is an appropriate sentence.  The defendant contends that such a sentence of incarceration is excessive in the particular circumstances of his conduct and the other factors that the Court must consider.

11. The defendant owns and operates a martial arts studio, Anaconda Training Center, in his community.  From it he reports that he earns approximately $600.00 a week.  He has, as a

single parent, custody of his daughter, now seventeen, who is in school and helps him when she can in running his business.

12. The defendant submits that a period of probation, in lieu of incarceration, combined with community service, would satisfy the "need for the sentence…to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." During this time, the defendant would be answerable to the U.S. Probation Office. He would be subject to the jurisdiction of the Court, knowing that any infraction could lead to revocation of the probationary term, with incarceration to follow. Such a term would at the same time provide deterrence specific to the defendant, operating as a disincentive to further criminal behavior.

13. A term of probation would also deter generally. The public is aware, from the comprehensive coverage of the January 6 events and the arrests that followed, of the serious efforts the government has made to prosecute persons involved with the protests and, in many cases, the violence that was perpetrated. These cases, from beginning to end, have been watched very closely by the press where defendants live, so the public will be aware of the defendant's responsibility for his conduct. That can serve to deter others in the future in similar situations.

14. The defendant submits that a probationary term would satisfy the various §3553 factors. The Court may also impose, and the defendant is amenable to a requirement of community service. Last, in the event that this Court believes that incarceration, not straight probation, is appropriate, the defendant requests that the Court permit him to serve his time in home confinement, with an exception for employment outside the home, or alternatively, in intermittent confinement so he may maintain his martial arts studio, the source of his livelihood, and make suitable arrangements for accommodations for his daughter, who lives with him.

15. For all the reasons noted above, the defendant respectfully requests a sentence of probation combined with community service.

This pleading is,

Respectfully submitted,

/s/

NATHAN I. SILVER, II
Unified Bar #944314
6300 Orchid Drive
Bethesda, MD 20817
(301) 229-0189 (direct)
(301) 229-3625 (fax)
email: nisquire@aol.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been served via ECF on Andrew Haag, Esq., USAO-U.S. Attorney's Office (DC) this 31st day of January, 2023.

/s/
_____
*Nathan I. Silver, II*